UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>   *Plaintiff*,<br><br>v.<br><br>THE EQUIVALENT VALUE OF USDT, OR TETHER, AS CURRENTLY ASSOCIATED WITH TETHER WALLET ADDRESS ENDING IN diem, TETHER WALLET ADDRESS ENDING IN pe7s, and TETHER WALLET ADDRESS ENDING IN nTmn,<br>   *Defendants*.<br><br>[CLAIMANT: TETHER] | No. 3:25-cv-1384 |

## VERIFIED COMPLAINT OF FORFEITURE

Now comes Plaintiff, United States of America, by and through its attorneys, David X. Sullivan, United States Attorney for the District of Connecticut, and David C. Nelson, Assistant United States Attorney, and respectfully states that:

1. This is a civil *in rem* action brought to enforce the provisions of 21 U.S.C. § 841, 21 U.S.C. § 846; 21 U.S.C. § 959, 18 U.S.C. § 1956, and 18 U.S.C. § 1957.

2. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 & 1355. Venue is appropriate in the District of Connecticut by virtue of 28 U.S.C. § 1395(b).

3. The Defendants Assets are the equivalent value of USDT, or Tether,[1] as associated with Tether Wallet Address TFg7bFTc3NDLFjF2aEryRrhjCpNS3F**diem** ("Defendant Asset 1"), THogjBskeFpktSyzzLntDwGwXtjekX**pe7s** ("Defendant Asset 2"), and TKk4KBH5zYFzyHjguhikEkttUwvpi3**nTmn** ("Defendant Asset 3") (collectively,

---

[1] Tether is a type of cryptocurrency known as a stable coin that is pegged to the United States dollar, where one USDT is designed to be worth one U.S. dollar at all times.

"Defendant Assets").

4. The Defendant Assets are property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1) and/or 21 U.S.C. § 959, or a conspiracy to commit such offenses in violation of 21 U.S.C. § 846, and/or any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such offenses, and, therefore, subject to forfeiture pursuant to 21 U.S.C. § 881(a). Additionally, the Defendant Assets are property involved in money laundering offenses, or a conspiracy to commit such offenses, in violation of 18 U.S.C. §§ 1956 and 1957 and/or are property traceable to such property, and therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A).

5. The Defendant Assets are located within the jurisdiction of this Court.

## Background

6. Transnational Criminal Organizations ("TCO") use a variety of methods to move the proceeds of their drug distribution and other funds to further their drug trafficking operations. One method involves moving cryptocurrency through unhosted cryptocurrency wallets. Specifically, by moving cryptocurrency through unhosted wallets, TCOs are able to conceal—or attempt to conceal—the source of their funds. As a result, cryptocurrency wallets are involved in money laundering.

7. In this case, law enforcement knows through facts learned during its investigation, set forth below, that certain cryptocurrency transactions and wallets contained proceeds of drug trafficking, facilitated drug trafficking, and were involved in money laundering. Focusing on these transaction and wallets, law enforcement then used blockchain analysis tools to trace backward, to learn which wallets transferred cryptocurrency to the identified wallets, and

trace forwards, to learn where the identified wallets sent cryptocurrency. All of the transactions herein were made in furtherance of the TCO's drug trafficking conspiracy.

8. Since 2023, law enforcement has been investigating a TCO that uses aircrafts to smuggle 1,000 kilogram quantities of cocaine throughout the world. Law enforcement have utilized a reliable Confidential Source ("CS"). The CS was introduced into the TCO as an aircraft broker and money launderer who could act as an intermediary to secure airplanes to allow the clandestine shipment of cocaine and other substances between different countries. The CS purported to coordinate between Suspect #1 and Suspect #2 to provide a plane to transport cocaine for further distribution.

9. In early 2025, the CS communicated with Suspect #1. Suspect #1 traffics significant quantities of cocaine in Apure, Venezuela. Specifically, Suspect #1, and individuals who work for him, facilitate the sale of cocaine to buyers.

10. In early 2025, the CS received an incoming call from Suspect #2 on WhatsApp. During this call, Suspect #2 stated there was a West Wind II aircraft available, and that the CS would have to provide a "left seat," meaning a pilot in command.

11. Suspect #2 was involved in a drug trafficking organization ("Suspect #2 DTO").

12. During the call, Suspect #2 alluded to where the aircraft was, by referring to it as "Baha," which meant the Bahamas. Suspect #2 stated this aircraft will be provided a let out, indicating that this plane will leave "black," which means unmonitored and undetected.

13. Shortly thereafter, the CS conducted a recorded call to Suspect #2 on WhatsApp. During this call, the CS requested Suspect #2 provide the tail number and a video for the aircraft that would be utilized to conduct the drug smuggling event.

14. During the conversation, Suspect #2 requested the CS to provide a "driver," that is, a pilot,

for this venture. As the conversation continued, Suspect #2 requested the CS send the pilot to the "location" - the Bahamas, where the aircraft was located.

15. Suspect #2 and the CS then negotiated how the money would be paid to Suspect #2. Suspect #2 requested enough money to move his own personal aircraft between "30-40," meaning, $30,000-$40,000. As the call neared the end, the CS and Suspect #2 spoke about utilizing a cryptocurrency wallet to transfer those funds. Suspect #2 continued to press the CS for a guarantee that this drug smuggling venture would be conducted. Eventually, the wallet that was provided by the Suspect #2 DTO was paid approximately 30,000 in USDT ("Tether"), which is a cryptocurrency.

16. On the same date, Suspect #2 forwarded a WhatsApp message to the CS which read "N320MD," which law enforcement knows to be a tail number for an airplane.

17. Shortly thereafter, the CS had another recorded call with Suspect #2 on WhatsApp. During this call, Suspect #2 explained to the CS how the airplane designated by tail number N320MD would leave the Bahamas undetected by law enforcement. Suspect #2 said that the aircraft would be moved from "the City" (Nassau) to "the letout" (Exuma Airport). Suspect #2 asked to bring the pilot to "the City" and then take a short ride to "the letout." As the conversation continued Suspect #2 presented other options to the CS for locations to smuggle cocaine and the money deposits would be required prior to takeoff of the aircraft.

18. Later in 2025, the CS conducted a recorded WhatsApp call with Suspect #2. During this call, Suspect #2 asked for the CS to find a person to come to the Bahamas to verify the aircraft's existence and location.

19. That same day, the CS and Suspect #2 conducted another recorded call, in which the CS told Suspect #2 that they (the TCO) would be providing the pilot's passport to the CS. The CS

stated this would be the "left" pilot.

20. Shortly after, the CS received a passport of an Argentinian National. The CS told Suspect #2 that this individual was a pilot who was in Brazil waiting to pilot the airplane designated by tail number N320MD during the smuggling operation.

21. A few days later, the CS again spoke to Suspect #1. During this conversation, Suspect #1 provided the CS with a cryptocurrency wallet known as Defendant Asset 1 for the purpose of receiving $5,000 in USDT for living expenses for the pilot who would be waiting in the Bahamas while the drug smuggling venture would be organized and executed. The CS then provided law enforcement a receipt that 4,991 USDT was sent to Defendant Asset 1.

22. This directly implicated Defendant Asset 1 in facilitating drug trafficking and involved Defendant Asset 1 in money laundering.

23. Law enforcement learned an individual with the alias "D" would be introduced into the conversations between the CS and Suspect #2 as the person who would provide the "letout" for this aircraft to leave the Bahamas undetected to commence the drug smuggling venture.

24. Law enforcement subsequently learned that unknown individual referred to "Don Miguel" works for the Oficina De Envigado, who is the financial arm for the Sinaloa Cartel.

25. The Sinaloa Cartel is a major transnational criminal organization based in Sinaloa, Mexico, that specializes in the trafficking of illegal drugs, money laundering, and other illicit activities.

26. "Don Miguel" approved the movement of finances on behalf of the Oficina De Envigado. This is a crucial role; "Don Miguel" sanctions the transfer of cryptocurrency for illegal activities such as drug trafficking.

27. "Don Miguel" was responsible for approving the 30,000 USDT for the acquisition for the

aircraft, as a finder's fee for the Suspect #2 DTO. If the drug smuggling venture was successful, in seven days after the venture, "Don Miguel" would send approximately 30% of the load, which would equate to approximately 800,000 USDT to an undercover law enforcement wallet for the Suspect #2 DTO.

28. In early 2025, the CS provided the undercover law enforcement cryptocurrency wallet to "Don Miguel" for the purpose of depositing approximately $30,000 USDT transfer to hold the aircraft for the drug smuggling event as discussed above.

29. "Don Miguel" made a test transaction of $10 USDT to the undercover law enforcement wallet. Once law enforcement received these funds, the CS then notified Suspect #1 that the $10 USDT was received.

30. Once Suspect #1 received confirmation, "Don Miguel" then sent $30,114.54275 USDT to the undercover law enforcement cryptocurrency wallet.

31. Ultimately, the CS learned from "D" that the airplane designated N320MD would not be suitable for drug smuggling because of law enforcement scrutiny. The Suspect #2 DTO then offered the CS multiple alternative aircraft to complete the transaction.

32. In 2025, the CS and Suspect #2 discussed the location for the sale of the drugs being transported. During this call, Suspect #2 agreed to move the drugs, with the final destination being within the District of Connecticut. The CS was located in Connecticut at the time of this call.

33. Suspect #2, the CS, and another individual had a second call. In this call, Suspect #2 agreed to move the drugs, ultimately to the District of Connecticut. The CS was located in Connecticut at the time of this call.

6

## Tracing

34. Cryptocurrency transactions are often utilized to launder the proceeds derived from narcotic trafficking. More specifically, narcotics traffickers in source countries (e.g., Mexico and Colombia) provide narcotics to consumer countries (e.g., the United States). The bulk currency proceeds derived from the sale of these narcotics are then returned to the narcotics traffickers within the source countries utilizing various methods, including the use of cryptocurrencies.

35. Narcotics traffickers often contact brokers, or professional money launderers, who are responsible for collecting the bulk currency within the consumer countries and depositing the currency into the banking system. The brokers often then pay out the narcotics traffickers in fiat currency within the source countries, minus a commission, and sell the cryptocurrency to a separate "crypto" broker. These crypto brokers then often sell the cryptocurrency in the black market in exchange for various fiat currencies.

36. Law enforcement identified the Defendant Assets and other cryptocurrency wallets that were involved in sending the USDT to the undercover cryptocurrency wallet. *The Defendant Assets and other cryptocurrency wallets made all the transfers discussed below on the same day and within 12 hours of the ultimate transfer to the undercover cryptocurrency wallet.*

37. Times throughout this section are listed as Coordinated Universal Time ("UTC").

38. Wallet TK8k8mdX3fsj3saRm2k6HrgqkW6Edo**gRCB** sent approximately three million USDT to Defendant Asset 2 on March 17, 2025, at approximately 8:07:42 a.m.

39. Similarly, Wallet TN4SoH6DAAPdyNj8gpwjdNKycsSV5S**MHxG** sent approximately three million USDT Defendant Asset 3 on March 17, 2025, at approximately 8:56:15 a.m.

40. Approximately 11 minutes later, the Suspect #2 DTO used Defendant Asset 2 to send approximately 1.7 million USDT to Wallet TQ6Yb9Mh3BnNTTpA6vipW6vDWtvFPq**zvoZ**.  The Suspect #2 DTO also used Defendant Asset 3 to send approximately 1.2 million USDT to Wallet ending **zvoZ**, which is the same wallet that received a transfer from Defendant Asset 2.

41. The above transactions are represented in the following graph:



Ex. 1 – Graphical Representation of Transcations

42. Approximately 9 minutes later, Wallet ending **zvoZ** sent approximately three million USDT to Wallet TRiRSd8wUpmMxo28WMGikR7vpLuz7V**PTmh**.

43. Approximately 15 minutes later, Wallet ending **PTmh** sent approximately 1 million USDT to Wallet TLjuTRRJrUiTb7ZjLsxToYqTA9EAtF**AUhA**.

44. Later that day (March 17, 2025), at 6:10pm, Wallet ending **AuhA** sent approximately $30,000 USDT to Wallet TTSre9v9DNKSQZEhtf6KD3Y8QDMxcc**iRgx**.

45. Approximately 15 minutes after this transfer, the CS communicated via encrypted messenger application with "Don Miguel." During this call, "Don Miguel" stated they (Oficina de Envigado) will provide $30,000 USDT to reserve the aircraft.

46. Approximately 47 minutes after the transfer on March 17, 2025, at 6:10pm, Wallet ending **iRgx** sent approximately 29,900 USDT to Wallet TUh59vzTjXFoneWmF5NVPuDR9NqzD7**Avrp**.

47. On March 17, 2025, at 8:38pm, Wallet ending **Avrp** paid the undercover law enforcement cryptocurrency wallet approximately 30,000 USDT.

48. The above transactions are represented in the following graph:



49. The Defendant Assets were seized pursuant to seizure warrants issued in the District of Connecticut.

50. The USDT tokens were burned and reissued pursuant to the seizure warrants.

51. The Defendant Assets are subject to forfeiture as they contain proceeds of drug trafficking and/or facilitating drug trafficking and/or were involved in money laundering.

Wherefore, the United States of America prays that a Warrant of Arrest In Rem be issued for Defendant Assets; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the property to be condemned and forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

The United States requests a trial by jury.

    DAVID X. SULLIVAN,
    UNITED STATES ATTORNEY

By:   /S/ David C. Nelson
    David C. Nelson (ct25640)
    Assistant U.S. Attorney
    157 Church Street, 24th Floor
    New Haven, Connecticut 06510
    Tel:  (203) 821-3700
    Fax:  (203) 773-5373
    David.C.Nelson@usdoj.gov

## **DECLARATION**

I am a Task Force Officer with the DEA, and the individual assigned the responsibility for this case.

I have read the contents of the foregoing Verified Complaint of Forfeiture and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of August, 2025.


/s/_____
MICHAEL LONEY
TASK FORCE OFFICER, DEA